**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JERRI L. DUNN and SHARON L.
TAYLOR,

                    **Plaintiffs,**

-vs-                          **Case No.  6:05-cv-1388-Orl-28DAB**

THOMAS G. COX,

                    **Defendant.**
_____

## ORDER

      Faced with competing claims to the retirement plan funds of one of its former

employees, Harris Corporation ("Harris"), as Plan Administrator for the Harris Corporation

Retirement Plan, initiated this case in September 2005 under the Employee Retirement

Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"), by filing a Complaint for

Interpleader.  (Doc. 1).  After a somewhat arduous procedural history, detailed below, the

case presented itself for resolution at a bench trial on January 29, 2008.  The Court now

issues the following ruling.

### I.  Background

      Buddy Cox ("Buddy") died on March 25, 2005.  Buddy, who had worked as an

electrical engineer for Harris, was enrolled as a participant in Harris's 401(k) Plan ("the

Plan").  Harris has identified itself as the administrator of the Plan, but Fidelity Human

Resources Services Company ("Fidelity") "provid[ed] administrative recordkeeping services

to the Plan" (see Doc. 56 at 3).  At the time of Buddy's death, his 401(k) account had a balance of approximately $450,000.  Buddy was unmarried at the time of his death but had three adult children – Sharon Taylor ("Ms. Taylor"), Brenda Cook ("Ms. Cook"), and Thomas Cox ("Dr. Cox"[1]).

It is undisputed that Harris and/or Fidelity had two beneficiary designation forms on file at the time of Buddy's death.  On one of those forms, Buddy designated his son, Dr. Cox, as the sole beneficiary of his 401(k) funds upon his death.  Buddy made this designation on a Harris Corporation Retirement Plan Participation Form; the form is signed by Buddy and is dated August 2, 1990.  (A.R. 030).[2]  A second form – unsigned and undated – listed one of Buddy's daughters – Ms. Taylor – and Jerri Dunn ("Ms. Dunn"), Buddy's "significant other," as the primary beneficiaries, 50% each.  (A.R. 031).  The back of this form is stamped "Fidelity Investments Institutional Operations Co. 01 APR 14 PM 1:32" (A.R. 032), seemingly indicating that Fidelity received the form on April 14, 2001.[3]

One month after Buddy's death, on April 25, 2005, Ms. Taylor and Ms. Dunn sent a letter to Fidelity notifying Fidelity of Buddy's death "on behalf of Beneficiaries of Benefits." (A.R. 007).   The next day, Buddy's other daughter, Ms. Cook, was issued letters of administration as personal representative of Buddy's estate.  (A.R. 024).  On May 2, 2005,

---

[1]Thomas Cox is a veterinarian.

[2]Citations to the administrative record that was before the Harris's Employee Benefits Committee – which was submitted as Plaintiff's Trial Exhibit 1 – are indicated by "A.R." followed by the page number.

[3]Additionally, the front of the form bears a date stamp of April 19, 2001.  (A.R. 031).

the attorney handling the probate of Buddy's estate sent a letter to Harris asking Harris to inform Fidelity of Buddy's death.  (A.R. 023).   At some point in early May 2005, Fidelity established accounts for Ms. Taylor and Ms. Dunn to facilitate their receipt of funds from the 401(k), and Fidelity also sent them a distribution check of $1500.  (Dunn Aff., A.R. 098-100, at A.R. 099 ¶ 10; see also Letter of May 23, 2005, A.R. 017-018 (referring to payments to Ms. Taylor and Ms. Dunn)).

However, Buddy's son, Dr. Cox, made a claim to the 401(k) funds based on the 1990 beneficiary form, and on May 18, 2005, Harris's Employee Benefits Committee held a meeting to resolve the competing claims.  (See Mins. of 05/18/2005 Meeting, A.R. 016A-016C).  The Committee determined that the 1990 form was valid and that because the 2001 form "was not signed, it was not completed in accordance with the instructions on the form or the Committee procedures and, therefore, did not constitute a valid beneficiary designation under the Plan."  (Id. at 016B-016C).  The Committee thus determined that Dr. Cox was the rightful beneficiary.  (Id. at 016C).  On May 23, 2005, the Committee informed the three claimants of its decision and advised Ms. Dunn and Ms. Taylor of their right to appeal.  (Letter of May 23, 2005, A.R. 017-018).[4]

On June 28, 2005, Ms. Dunn, through an attorney, sent a letter to Harris requesting a review and appeal of the denial of her request for the Plan funds.  (A.R. 012-014).  In a letter dated September 30, 2005, the Harris Employee Benefits Committee informed Ms.

─────────────────────

[4]The letter also noted that "[a]ny benefit amounts that were distributed to Ms. Dunn and Ms. Taylor were distributed in error," and Ms. Dunn and Ms. Taylor were directed to "promptly repay to the Plan any such amounts that they received."  (Id. at A.R. 017).

-3-

Dunn, Ms. Taylor, and Dr. Cox that it had completed its review of Ms. Dunn's appeal at its September 8 meeting and had "voted to institute an interpleader action in the United States District Court for the Middle District of Florida, Orlando Division, to determine the entitlement to the Fund." (Letter of Sept. 30, 2005, Pl.'s Trial Ex. 4, at 1). That letter further stated: "Section 502(a)(1)(B) of [ERISA] provides claimants denied benefits the right to file a civil action in a state or federal court seeking the benefits denied herein. However, the interpleader action filed by Harris already places the question of who is entitled to the Fund before a federal court." (Id. at 2). The case sub judice – the interpleader action mentioned in the September 30 letter – was filed in this Court on September 21, 2005. (See Compl., Doc. 1).

Harris filed a Motion for Interpleader (Doc. 19), which was referred to the assigned magistrate judge. The magistrate judge issued a Report (Doc. 42) recommending that – due to Harris's failure to make a final determination as to the rightful beneficiary – the case be abated pending resolution by the Plan Administrator of Ms. Dunn's administrative appeal. On May 5, 2006, the Court adopted the Report and Recommendation, abated the action, directed the Plan administrator to resolve Ms. Dunn's administrative appeal, and informed the parties that they could thereafter seek review of the administrative decision. (Order, Doc. 51). The Motion for Interpleader (Doc. 19) was denied as premature. (See Doc. 51 at 2).

On May 11, 2006, the Harris Employee Benefits Committee informed the three claimants that Harris had been directed to resolve the appeal (see A.R. 040-041), and the claimants submitted materials to the Committee for consideration. The Committee met on

June 20, 2006 to decide the administrative appeal.  (See Mins., A.R. 104-109).  The Committee again determined that the second, unsigned beneficiary designation form was invalid and that Buddy's retirement benefits should be awarded to Dr. Cox.  (Id. at A.R. 107-09).

The Committee advised the claimants of its determination of the appeal and asked Ms. Taylor and Ms. Dunn to advise whether they abandoned their claims so that Harris could move to reopen the interpleader action in this Court, if necessary.  (Letter of June 28, 2006, A.R. 110-14).  Counsel for Ms. Dunn advised the Committee on July 27, 2006 that Ms. Dunn would "not be signing a release and has decided to move forward with her other litigation options."  (See A.R. 115).

On August 4, 2006, Harris moved to reopen this case and renewed its motion for interpleader.  (Doc. 56).  In that motion, Harris sought:  to be dismissed from the case with prejudice, with the proviso that the Court reserve jurisdiction over Harris only with regard to the investment of the disputed funds and payment of the funds upon final Order of the Court; to obtain an injunction barring all defendants from bringing any action against Harris or the Plan with regard to the fund; and to require the claimants to proceed to determine the proper disposition of the funds.  (Doc. 56 at 14).  The motion was referred to the magistrate judge, and no responses to the motion were filed.

On August 25, 2006, the magistrate judge issued a Report and Recommendation (Doc. 57) recommending that the motion be granted in part and denied in part.  Specifically, the Report recommended reopening the case; granting Harris's request for interpleader; dismissing Harris from active participation in the case but retaining jurisdiction over Harris

-5-

with regard to management of the funds pending disposition of the case; and denying Harris's request for injunctive relief without prejudice.  (Doc. 57 at 8).  No objections to the Report were filed, and the Court adopted it on September 19, 2006 (Doc. 58).  The case was reopened, and it retained its original trial date of September 2007.  (See id. at 2; Case Management & Scheduling Order, Doc. 37).  The parties were realigned, with Ms. Dunn and Ms. Taylor designated as Plaintiffs and Dr. Cox designated as Defendant.  (See Doc. 58 at 2).

Dr. Cox, appearing pro se at that point, moved for summary judgment (Doc. 60), and after Ms. Dunn responded (Doc. 61), the Court denied the motion as insufficiently supported (Doc. 75).  The case was mediated on May 21, 2007, but an impasse was declared.  (See Mediation Report, Doc. 76).  Ten days later, Ms. Dunn filed an unopposed motion to abate the case, noting that the parties wished to pursue informal negotiations to resolve the matter.  (Doc. 77).  The Court granted the motion, removed the case from the September 2007 trial calendar, and ordered the parties to file a status report on or before September 15, 2007.  (Order, Doc. 78).  On August 16, 2007, Dr. Cox moved to lift the abatement, stating that negotiations had failed.  (Doc. 79).  The magistrate judge granted that motion in part and set a case management conference for September 24, 2007.  (Order, Doc. 85).  After that conference, the magistrate judge set the case for trial in January 2008.  (Order, Doc. 88).

## II.  Trial Proceedings

The case came on for a bench trial as scheduled in January 2008; the trial lasted only one day.  In light of the contentious and tortuous procedural path that this case had taken

en route to trial, it came as no surprise that the parties disputed the applicable standard of review and whether evidence outside the administrative record could be introduced into evidence.  Prior to trial, Dr. Cox filed a motion in limine (see Docs. 91, 92, & 99) seeking clarification of the applicable standard; he urged that the "arbitrary and capricious" standard should apply because the Harris Plan granted discretion to the claims administrator.  He further asserted that the Court's review was limited to the materials in the administrative record.  Ms. Dunn opposed the motion (see Docs. 97 & 102), averring that the Court should conduct a de novo review of Harris's decision and accord it no deference; she further contended that she should be afforded an opportunity to challenge evidence submitted to Harris by Dr. Cox during the administrative appeal.  (See also Dunn's Am. Pretrial Mem., Doc. 104, at 6 (stating Dunn's opposition to Cox's position that review should be limited to the administrative record)).

The Court took up these issues as an initial matter on the day of trial.  At that point, however, counsel for Dr. Cox[5] agreed – and in fact suggested – that, in the interest of not further delaying resolution of the case with a potential remand following appeal, the Court should proceed "on a de novo hearing basis."[6]  Counsel for Ms. Dunn agreed to this

---

[5]As earlier noted, for several years Dr. Cox appeared pro se, both before Harris and the Court.  However, he has been represented by counsel in this Court since November 29, 2007.  (See Notice of Appearance, Doc. 93).

[6]Counsel for Dr. Cox also proposed that the Court could make alternative findings under the arbitrary-and-capricious standard that he asserted was applicable.  However, in light of the Court's conclusion that Dr. Cox prevails under even the less deferential de novo standard, such alternative findings are not necessary.

procedure, and the parties stipulated to the admission of depositions[7] into evidence and proceeded to call witnesses to testify in open court as well; they also stipulated to the admission of the administrative record that had been before the Committee.[8]  The parties agreed that the issue before the Court was which form controlled – the first beneficiary designation or the second, unsigned form.  Much of the evidence submitted by both sides was, at most, only marginally relevant to the question before the Court, but the parties were permitted wide latitude in presenting their cases.

    A.  Depositions and Administrative Record Evidence

Ms. Dunn testified in her deposition that she first met Buddy in November 1989, and they moved in together in July 1990.  (Dunn Dep. at 19-20).  She resided with Buddy until August 2003, when she moved about fifteen miles away to live with her ailing father.  (Id. at 5-6, 25).  Ms. Dunn first became aware that Dr. Cox was named a beneficiary of the 401(k) plan when Buddy filled out the designation form in August 1990.  (Id. at 31-32).  Buddy told her that he expected Dr. Cox to share the money with his sisters.  (Id. at 33).

In late March 2001, Ms. Dunn had a conversation with Buddy about changing the beneficiary designation to her and Ms. Taylor.  (Id. at 34-35).  As Ms. Dunn explained, Buddy

_____

[7]Four depositions were submitted into evidence during the trial – those of Ms. Dunn, Ms. Taylor, Dr. Cox, and Rachel Alexander.

[8]In the Eleventh Circuit, "a district court conducting a *de novo* review of an [a]dministrator's benefits determination is not limited to the facts available to the [a]dministrator at the time of the determination." Kirwan v. Marriott Corp., 10 F.3d 784, 789 (11th Cir. 1994).  As the Kirwan court noted, "[t]here is a split among the circuits as to whether a *de novo* review should include facts not before the plan administrator.  This circuit and the Third Circuit have squarely held that *de novo* review includes facts not before the administrator." Id. n.31 (citation omitted).

came in with the mail while Ms. Dunn was cooking lunch, and he said there was a beneficiary form in the mail.  (Id. at 35; see also Dunn Aff., A.R. 098-100, ¶ 2).  He then told her that he had decided he was going to leave the 401(k) to her and Ms. Taylor, 50/50.  (Dunn Dep. at 35; Dunn Aff. ¶¶ 3 & 5).  Ms. Dunn told him to leave it equally amongst his three children, but he told her that she and Ms. Taylor needed the money the most.  (Dunn Dep. at 35-36).  He then asked her for her social security number and called Ms. Taylor and obtained her social security number.  (Id. at 36; Dunn Aff. ¶ 6).  He filled out the form, licked the envelope, and sealed it.  (Dunn Dep. at 36).  Then, he took the form and other outgoing mail to the mailbox and put the flag up.  (Id.)[9]

The first time Ms. Dunn ever actually saw the form with her name on it as beneficiary was after Buddy died.  (Id. at 39).  She assumes this is the form he filled out that day in March 2001.  (Id.)  She did not watch him fill out the form; she "didn't care" and "felt he should have had it for his kids."  (Id.)  Ms. Dunn is surprised that Buddy did not sign and date the second beneficiary form.  (Id. at 40).  She does not know who else knew that Buddy intended to change the beneficiary designation to her and Ms. Taylor; "[h]e didn't say anything to anybody, probably."  (Id. at 42).

Ms. Dunn recalled a conversation where Buddy told Dr. Cox he had left the 401(k) funds to him and that he wanted Dr. Cox to divide the money up with his sisters.  (Id. at 62-

---

[9]In her affidavit, Ms. Dunn stated:  "After writing in the information on the beneficiary form, I watched Buddy place the form into the provided envelope and took it out to the mail box."  (Dunn Aff. ¶ 7).  When this sentence is read in a syntactically and grammatically correct manner, it does not state what Ms. Dunn likely intended for it to state.  In any event, as noted in the text, in her deposition Ms. Dunn testified that Buddy – not she – took the form to the mailbox.

63).  According to Ms. Dunn, Dr. Cox told Buddy not to leave him anything because he didn't

need anything.  (<u>Id.</u> at 63; <u>accord</u> Alexander Dep. at 5).  Ms. Dunn heard Dr. Cox repeat this

sentiment on two other occasions as well.  (Dunn Dep. at 62-64; <u>see also</u> Dunn Aff. ¶ 4).

     Sharon Taylor testified in her deposition that while Buddy was alive, she saw him

every day.  (Taylor Dep. at 9).  Ms. Taylor recalled receiving a telephone call from her father

in March 2001; he told her that he was filling out a bunch of papers, and he asked her for her

social security number and those of her three sons.  (<u>Id.</u> at 14; <u>see also</u> Taylor Aff., A.R. 103,

¶ 3).  Ms. Taylor never knew what that was for; she never found anything with her kids' social

security numbers on it.  (Taylor Dep. at 14).  Ms. Taylor assumed that Buddy wanted her

number in order to name her the beneficiary of something; she knew of no other reason for

him to ask.  (<u>Id.</u> at 15; Taylor Aff. ¶ 4).  Ms. Taylor did not know she was a beneficiary until

Ms. Dunn called her after Buddy's death and told her that the two of them were beneficiaries.

(Taylor Dep. at 21).  Ms. Dunn told Ms. Taylor that she had been there when Buddy filled out

the form.  (<u>Id.</u> at 22-23).

     Dr. Cox testified in his deposition that sometime in the 1990s, Buddy called him and

asked him if he would be the beneficiary on the 401(k) account and if he would split it with

his sisters so that, for the sake of convenience, Buddy could just put Dr. Cox's name on the

form and not have to get the other social security numbers.  (Cox Dep. at 12).  Dr. Cox

agreed to do so.  (<u>Id.</u>)  Dr. Cox denied ever telling Buddy that he did not need the money or

that Buddy should leave the money to his daughters, Ms. Taylor and Ms. Cook.  (<u>Id.</u>)  Dr.

Cox never told his father that he did not want any of his money.  (<u>Id.</u>)  According to Dr. Cox,

Buddy – an electrical engineer – was "very, very precise in his dealings" and "wouldn't have

not signed an important document like" the second beneficiary designation form.  (Id. at 31).

B.  Trial Testimony

Ms. Dunn, Ms. Taylor, Dr. Cox, Ms. Cook, and one other witness[10] testified at trial. Much of this testimony was irrelevant or redundant to the deposition testimony submitted. However, the live testimony did afford the Court an opportunity to assess the credibility of the witnesses.

Ms. Dunn testified that she met Buddy in November 1999 and the two became "boyfriend and girlfriend" in December 1999.  As she had in her deposition, Ms. Dunn recalled three occasions where Dr. Cox indicated that he was not interested in receiving any of the monies from Buddy's 401(k) plan.

Dr. Cox testified that Buddy named him as beneficiary of the 401(k) funds because Buddy trusted that Dr. Cox would divide it equally with his two sisters.  Dr. Cox did not become aware of the second, unsigned beneficiary form until Ms. Taylor called him and told him about it a few months after Buddy's death.  Dr. Cox described Buddy and Ms. Taylor as "very close," and Dr. Cox did not think that it was likely that Buddy would not have told Ms. Taylor about naming her as beneficiary.

Ms. Taylor testified[11] that she first became aware of the second beneficiary form a

_____

[10]The fourth witness, Lori Howell, testified that she had an intimate relationship with Buddy during the last two years of his life.  The Court did not find this testimony germane to the matter before it.

[11]Ms. Taylor appeared pro se at trial.  Though nominally a plaintiff along with Ms. Dunn, she did not present any argument or evidence.  She was called as a witness by her brother, Dr. Cox.

month or two after Buddy's death when Ms. Dunn called her and told her about it.  Buddy

had never told Ms. Taylor that he had named her as a beneficiary to the 401(k).  Ms. Taylor

saw Buddy daily before his death, and the two of them were "very" close.  Ms. Taylor again

recalled receiving a phone call from her father asking for her social security number, and she

assumed it had something to do with her being a beneficiary on something.  Buddy's other

daughter, Ms. Cook, testified that she first became aware of the unsigned beneficiary

designation form when Dr. Cox told her about it after Buddy died.

### III.  Discussion

As earlier noted, the parties agreed at trial that this Court should conduct a de novo

review of the Committee's determination regarding the competing beneficiary designation

forms.  "*De novo* review . . . offers the highest scrutiny (and thus the least judicial deference)

to the administrator's decision.  In fact, [the court] afford[s] *no* deference . . . ."  Williams v.

BellSouth Telecomms., Inc., 373 F.3d 1132, 1137 (11th Cir. 2004).[12]  Under the de novo

standard, a court's task is to determine whether the administrator's decision is "wrong" – that

is, whether the court disagrees with it.  Williams, 373 F.3d at 1138; see also HCA Health

Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 n.23 (11th Cir. 2001)

(noting that "'[w]rong' is the label used by our precedent to describe the conclusion a court

reaches when, after reviewing the plan documents and disputed terms *de novo*, the court

_____

[12]Under Williams, a de novo review is the first step in judicial review regardless of
what standard ultimately applies.  373 F.3d at 1137-38 (instructing courts to first apply the
de novo standard and if the court does not disagree with the administrator's decision, the
inquiry ends; if the court does disagree, then further analysis – regarding discretion and
conflicts of interest, for example – is undertaken).

disagrees with the plan administrator's plan interpretation").    Having considered the administrative record, the live and deposition testimony of witnesses, and the parties' arguments, the Court does not disagree with the Committee's determination and thus does not find that it was "wrong."[13]

Ms. Dunn presents a two-pronged argument in support of her position that the second beneficiary designation form should be given effect.  First, she contends that under the Plan, a signature is not required for a beneficiary designation to be valid.  Second, she argues that even if a signature is technically required, the doctrine of "substantial compliance" should be applied to give effect to the second form notwithstanding the lack of a date and signature. These contentions are addressed in turn.

A.  Beneficiary Designation Requirements

Ms. Dunn first argues that the Plan does not require that a beneficiary designation be signed to be effective.  This argument is not well-taken.

The Harris Corporation Retirement Plan, as amended and restated April 1, 2001 – the version in effect at the time of receipt[14] of the unsigned beneficiary designation form on April

---

[13]By agreeing to the Court's de novo review of the beneficiary determination, the parties essentially gave the Court the discretion to interpret the Plan.  Cf. Forcier v. Metro. Life Ins. Co., 469 F.3d 178, 183 (1st Cir. 2006) ("[B]y acquiescence of the parties, the district court enjoyed the same latitude as the insurer for purposes of making the initial benefits determination.").

[14]The Plan in effect at the time of Buddy's death – the 2003 version – provides as follows regarding beneficiary designation:

Section 9.7.   Designation of Beneficiary.   (a) In General.   Each Participant shall have the right to designate a Beneficiary or Beneficiaries (who may be designated contingently or successively and that may be an entity

14, 2001– provides in pertinent part as follows regarding designation of beneficiaries:

>    7.9    <u>Designating Beneficiaries.</u>
>
>    (a) <u>Written Designation</u>.  Each Participant may designate, in the manner prescribed by the Retirement Plan Administrative Committee, a Beneficiary or Beneficiaries to receive any benefits payable as a result of the death of the Participant.  This designation may be changed by the Participant at any time by giving notice to the Retirement Plan Administrative Committee in accordance with rules and procedures established by the Retirement Plan Administrative Committee.  Any designation of a Beneficiary other than the Participant's spouse must be consented to by the spouse in writing (or other method permitted by the Internal Revenue Service) and witnessed by a notary public (or a representative of the Plan prior to October 1, 1993).

(Pl.'s Ex. 2 at 55).  Additionally, the instructions to the beneficiary designation form provide

that "[b]y signing and dating this section, you officially designate the person(s) listed on the

form as your primary beneficiary(ies), and if applicable, your secondary beneficiary(ies) for

---

>    other than a natural person) to receive any distribution to be made under this Article upon the death of such Participant or, in the case of a Participant who dies after his or her termination of employment but prior to the distribution of the entire amount to which he or she is entitled under the Plan, any undistributed balance to which such Participant would have been entitled. . . . [A] Participant may from time to time, without the consent of any Beneficiary, change or cancel any such designation.  Such designation and each change thereof shall be made in the manner prescribed by the Administrative Committee and shall be filed with the Administrative Committee.

(Pl.'s Ex. 3 at 44-45).  Although the parties have not argued at length over which version of the Plan governs the determination of whether the second form is effective, Ms. Dunn suggested in closing argument that the 2003 version, instead of the 2001 version, applies. The Court disagrees, but this distinction is meaningless.  The terms of the two plans are substantially equivalent with regard to beneficiary designations – both essentially require designation by the participant as required by the Committee.  (<u>Compare</u> 2001 Plan § 7.9(a) (providing for "giving notice to the [Committee] in accordance with rules and procedures established by the [Committee]), <u>with</u> 2003 Plan § 9.7(a) (providing that "[s]uch designation and each change thereof shall be made in the manner prescribed by the Administrative Committee and shall be filed with the Administrative Committee")).

these Plans.  Your beneficiary designation(s) will not be valid unless this form is on file with

the recordkeeper for these Plans." (Beneficiary Designation Instructions, A.R. 020).[15]

The 2001 beneficiary designation form at issue in this case contains three lines at the

top for name, address, social security number, and phone number to be filled in.  These

items have been filled in with Buddy's information.  (A.R. 031).[16]  The form contains a box

for designation of "Primary Beneficiary(ies)," within which, following the preprinted statement

"I hereby designate my primary beneficiary(ies) as follows," is a listing of Ms. Dunn and Ms.

Taylor as 50/50 beneficiaries.  (Id.)  Beneath this box is a box for contingent beneficiary

designation, which has been left blank.  (Id.)  Below that, there is a box for "Participant's

Signature" and "Date," which includes the following preprinted statement above the signature

and date spaces:

> I designate the above-named persons as my primary and/or
> contingent beneficiaries to the Plan.  I reserve the right to revoke
> this beneficiary designation at any time by delivering a new
> Beneficiary Designation Form to Fidelity Investments.  To name
> someone other than, or in addition to, my spouse as primary
> beneficiary under the Plan, I realize I must obtain my spouse's
> consent below.   Information herein replaces all previous
> designations I may have made.

(Id.)  The signature and date lines are blank – the crux of this case.[17]

_____

[15]A more legible copy of this document appears in the record as Defendant's Trial Exhibit 3.

[16]Both Ms. Dunn and Ms. Taylor testified that the handwriting on the form is Buddy's.

[17] Below this box is a box for "Spousal Consent," which includes a space for a notary signature and which has been left uncompleted.  (A.R. 031).  Because Buddy was not married at any time relevant hereto, this spousal consent space is not relevant to this case except insofar as it pertains to Ms. Dunn's argument that a signature was required only by

Considering all of these provisions – in the Plan and on the forms themselves – the Court finds that the Participant's signature is required for a valid beneficiary designation to be made.  The Plan states that a beneficiary designation may be made by a *Participant* through a *written designation* and in a manner prescribed by the Committee; and may be changed by giving notice in accordance with procedures established by the Committee. (See 2001 Plan § 7.9(a)).  The Plan also gives the Committee the discretion "to determine eligibility for benefits and construe the terms of the Plan" and provides that "[b]enefits under the Plan will be paid only to a Participant or Beneficiary if the Retirement Plan Administrative Committee decides in its discretion that the Participant or Beneficiary is entitled to benefits." (2001 Plan § 11.3, Pl.'s Ex. 2 at 74; see also 2003 Plan § 13.1(d), Pl.'s Ex. 3 at 58 ("The Administrative Committee shall have the duty and authority to interpret and construe, in its sole discretion, the terms of the Plan in all respects, including, but not limited to, all questions of eligibility, the status and rights of Participants, distributees[,] and other persons under the Plan . . . . Benefits will be paid under the Plan only if the Administrative Committee decides in its sole discretion that the applicant is entitled to benefits.")).

Additionally, the instructions to the beneficiary designation form clearly instruct the participant that an official designation is made "by signing and dating" the form.  The form itself clearly includes a place for a signature and date beneath a statement regarding designation of beneficiaries and replacement of prior designations, but no signature or date was indicated on the second form.  The Plan gave the Committee the discretion to interpret

_____

a spouse giving consent.  The Court finds no merit in this contention, however.

the requirements of the Plan, and reading the Plan and the form to require a signature is both reasonable and correct.

Ms. Dunn contends that there is no evidence that Buddy ever read or received the instructions to the form, but this assertion – to the extent this point is even relevant – is merely speculative.  Moreover, the very argument that a signature is not required merely begs the question of whether Buddy is the one who made the designation on the second form.  Anyone could fill out a form and send it in naming a beneficiary; without a signature, the identity of the "designator" cannot be conclusively determined.  The lack of a signature is not a minor technicality that should be lightly overlooked or excused.  Cf. Alliant Techsystems, Inc. v. Marks, 465 F.3d 864, 871 (8th Cir. 2006) (finding no abuse of discretion in administrator's decision to give effect to beneficiary designation form that was signed and listed name of beneficiary but did not list the "relationship" of the beneficiary to the decedent).  In sum, the Court agrees with the Committee's decision to require a signed form for an effective beneficiary change.  The Court rejects Ms. Dunn's argument that a signature is not required under the Plan.

B.  Substantial Compliance

Ms. Dunn also argues that even if a signature is required by the Plan, the 2001 form should nevertheless be given effect under the doctrine of "substantial compliance."  This doctrine, in varying forms, has been endorsed in ERISA cases in some circuits, though not expressly by the Eleventh.  See, e.g., Liberty Life Assur. Co. of Boston v. Kennedy, 358 F.3d 1295, 1303 (11th Cir. 2004) ("[Appellant] urges us to apply the federal common law doctrine of substantial compliance to give effect to the beneficiary designation in Mr. Kennedy's will.

-17-

Our decision obviates the need to discuss th[is] argument[].")[18]; Metro. Life Ins. Co. v. Johnson, 297 F.3d 558, 566-69 (7th Cir. 2002) (applying "federal common law doctrine of substantial compliance" and concluding that decedent substantially complied with requirements for change of beneficiary); BankAmerica Pension Plan v. McMath, 206 F.3d 821, 830 (9th Cir. 2000) (applying California's doctrine of substantial compliance in an ERISA case). See generally Kmatz v. Metro. Life Ins. Co., 232 Fed. Appx. 451, 456 (6th Cir. 2007) (collecting cases and noting that "while other circuits have embraced the substantial-compliance doctrine, in some instances as a matter of state law and in some instances as a matter of federal common law, our take on the doctrine is less clear") (citations omitted).

Ms. Dunn urges the court to employ the substantial compliance test approved by the Fourth Circuit in Phoenix Mutual Insurance Company v. Adams, 30 F.3d 554, 564 (4th Cir. 1994), which the court applied as a matter of "federal common law": "'[A]n insured

---

[18]In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered by the former Fifth Circuit prior to October 1, 1981. Ms. Dunn cites Bohannon v. Manhattan Life Insurance Co., 555 F.2d 1205 (5th Cir. 1977), for the proposition that the doctrine of substantial compliance should apply in this circuit. Bohannon was not an ERISA case, and the court applied Georgia law. The court did state that "[a] change-of-beneficiary is effective when it is clear that the insured intends a change, has a right to make a change, and takes reasonable steps to bring about a change. Generally, substantial compliance with these conditions is sufficient." Id. at 1210 (citations omitted).

The Court need not resolve whether Bohannon establishes "substantial compliance" as the law of the Eleventh Circuit in ERISA cases because, as noted in the text, even if it applies, as a factual matter the Court finds it has not been established in this case. In Bohannon, the beneficiary designation form was "signed in blank" by the decedent, and the court concluded that "the factual question of whether he intended to change the beneficiary should have been determined by the jury." Id. at 1210-11. Here, this Court has determined, as the finder of fact following a bench trial, that such an intention by Buddy has not been convincingly established.

substantially complies with the change of beneficiary provisions of an ERISA life insurance policy when the insured: (1) evidences his or her intent to make the change and (2) attempts to effectuate the change by undertaking positive action which is for all practical purposes similar to the action required by the change of beneficiary provisions of the policy.'" (Quoting district court decision, 828 F. Supp. 2d 379, 388 (D.S.C. 1992)).  This Court need not decide whether the doctrine of substantial compliance should be applied here as a matter of law because even if it did, substantial compliance has not been established as a matter of fact in this case.  See, e.g., Phoenix, 30 F.3d at 565 ("[W]hether the beneficiary to a life insurance policy has been changed is a question of fact.  Whether the policyholder took steps to effectuate the change is also a question of fact.") (citation omitted).

Ms. Dunn has cited no case where substantial compliance was found under circumstances similar to those currently before the Court.  In the cases upon which she relies for her substantial compliance argument, there was other evidence from disinterested witnesses to support a finding of the insured's intent to change his beneficiary despite minor noncompliance with a requirement.  See id. at 567-68 (finding substantial compliance where insured had left "change beneficiary to" line blank but thereafter instructed person in charge of making such changes to make the change, and through inadvertence of finance department employee the change was not effectuated prior to insured's death); First Cap. Life Ins. Co.-in Conservation v. AAA Commc'ns, Inc., 906 F. Supp. 1546 (N.D. Ga. 1995) (finding substantial compliance and manifestation of intent where designator did all that it could but form was not received due to mistake in the "ministerial action" of someone else in not sending in the form).

Clearly, each case turns on its unique facts, and the unique facts of this case – which

consist of self-serving testimony by the potential beneficiary, whom the Court did not find to

be a credible witness, and a significant shortcoming in a lack of a date and signature[19] – do

not support a finding of substantial compliance even if the doctrine applies in this circuit. Cf.

McMath, 206 F.3d at 830-31 (refusing to give effect to unsigned beneficiary designation

form, finding no substantial compliance with signature requirement); Metro. Life Ins. Co. v.

Kubichek, 83 Fed. Appx. 425, 428, 429 (3d Cir. 2003) (rejecting claim of purported

beneficiary, finding no substantial compliance with change-of-beneficiary requirements

where there was evidence of a letter, produced by the alleged beneficiary during the

litigation, "purportedly sent from the decedent" asking life insurer to confirm change of

_____

[19]The Court did locate two cases case where unsigned beneficiary designation forms were given effect, but they do not alter the conclusion herein. In Davis v. Combes, 294 F.3d 931, 942 (7th Cir. 2002), the Seventh Circuit gave effect to an unsigned, undated change-of-beneficiary form where the decedent "attempted to make the change at the same time that she successfully named [the same person – her sister –] the beneficiary of [other] policies] . . . , requested the change of beneficiary form . . . and completed the form in its entirety (including [an] effective date) with the exception of the signature and date lines." The court found substantial compliance under the Fourth Circuit's Phoenix standard, noting that "there will be situations in which a failure to sign and date a beneficiary designation may cast significant doubt on whether the policy holder actually decided to go through with the change" but "there are other cases in which the evidence will unequivocally establish that the policy holder intended to make the new beneficiary designation and took positive action to effectuate that intent." Id.
    Additionally, in O'Shea v. First Manhattan Co. Thrift Plan & Trust, 55 F.3d 109 (2d Cir. 1995), the issue was whether the decedent's retirement benefits should pass through her will or pursuant to an unsigned beneficiary designation form. The decedent had returned one page of the designation – listing a beneficiary – but the Plan had not sent her the second page, which contained the signature line. The Plan's decision to award the benefits to the beneficiary named on the unsigned form was affirmed on review under the arbitrary and capricious standard. See id. at 113 ("In light of the Plan's discretionary language and the stipulated authenticity of the handwriting on the Designation Form, we find ample grounds to uphold the Trustees' decision as being neither arbitrary nor capricious.").

beneficiary" where the letter was "of questionable authenticity" and even if authentic "would fall short of showing that the decedent did complete and submit the proper forms, or even that he tried to, and substantially did, do so"); Life Ins. Co. of N. Am. v. Leeson, 81 Fed. Appx. 521, 523-24 (6th Cir. 2003) (finding no substantial compliance where, after decedent's death but before payout of benefits, decedent's widow "delivered to the insurance company a change-of-beneficiary form purportedly signed by [the decedent] that named her as beneficiary"; decedents' actions "did not meet the . . . requirement that *the insured* give written notice to his employer or to the insurance company" of a change in beneficiary); Robinson v. MeadWestvaco Corp. Sav. & Employee Stock Ownership Plan, 446 F. Supp. 2d 437, 444-46 (D.S.C. 2006) (finding no substantial compliance where purported beneficiaries presented evidence that decedent had visited plan's website, allegedly with purpose of making beneficiary change).

Ms. Dunn notes the statement of the Supreme Court that "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence." (Pl.'s Am. Pretrial Mem., Doc. 104, at 8 (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003)). However, here both the Court and the Committee have both found Ms. Dunn's evidence unreliable. Unlike cases where a disinterested witness provides corroborative evidence of the decedent's intent, in this instance no such evidence has been presented. In sum, even if the doctrine of substantial compliance applies, the Court finds the second beneficiary designation form ineffective to change the designation of Dr. Cox as the sole beneficiary as indicated on the signed August 1990 form.

C. "Procedural Irregularities"

Ms. Dunn has also suggested several procedural improprieties with regard to the way the competing benefit claims were handled by Harris and Fidelity.  She argues that she should be awarded the 401(k) funds because neither Harris nor Fidelity sent the unsigned form back to Buddy for a signature.  She also contends that Harris engaged in a "truncated" review process with arbitrary deadlines.  However, both of these arguments are rejected.

First, while all parties agree that it would have been better for everyone if the second form could have been clarified in some manner – and thus all of this litigation avoided – the Court does not find a basis to give effect to the second, unexecuted form for this reason alone.  The only person who can conclusively resolve the issue of the missing signature – Buddy – is no longer available to do so.  A decision must nevertheless be made one way or another regarding the efficacy of the second form, and the Court has done so above.

Second, Ms. Dunn's challenge to the deadlines imposed by the Harris Committee is not well-taken.  The record reflects that Ms. Dunn's counsel asked for time to submit information, obtained a response and a deadline, and informed the Committee that all of the information would be submitted by the appointed time.  (See A.R. 084-094).  In any event, Ms. Dunn was afforded abundant opportunity to submit evidence and present witnesses here in this Court, and the Court reached the same decision as did the Harris Committee.

D.  Motion for Reconsideration (Doc. 98)

Prior to trial, on December 14, 2007, Ms. Dunn filed an "Unopposed Motion for Reconsideration and for Bifurcation" (Doc. 98) seeking reconsideration of the September 25, 2007 denial (see Order, Doc. 88) by the magistrate judge of her Renewed Motion for Leave

to Amend Answer (Doc. 86, filed September 21, 2007).  In both the first and second motions to amend her answer, Ms. Dunn sought to add a claim against Harris for breach of fiduciary duty based on its handling of the unsigned beneficiary designation form.  During trial, she urged the Court to grant her motion to reconsider the denial of the second motion.  However, Ms. Dunn's position on reconsideration is not well-taken for several reasons.

First, Ms. Dunn did not timely seek reconsideration of the magistrate judge's Order – instead waiting almost three months to request such reconsideration.  Second, the motion for leave to amend the answer was itself untimely – it was filed in September 2007, but the deadline for leave to amend pleadings passed in April 2006.  Although this case was abated in May 2006 and not reopened until September 2006 – after the Harris Committee determined Ms. Dunn's appeal – the Court informed the parties at that time that the Case Management and Scheduling Order entered in February 2006 remained in effect, though noting that the parties could request to have the scheduling order amended.  (See Order, Doc. 58, at 2).  Neither party sought to amend the scheduling order until Ms. Dunn requested to do so four months later, in January 2007 (see Doc. 63), at the same time she filed her first motion to amend her answer (Doc. 62).

Finally, Ms. Dunn's attempt to add a claim against Harris is futile in any event.  The same day that the magistrate judge denied her second motion for leave to amend, Ms. Dunn filed a second case in this court, Case No. 6:07-cv-1526, attempting to state a claim against Harris based on its handling of the second beneficiary designation form.  However, as explained in an Order entered in that case today, Ms. Dunn has no viable claim against

Harris.[20]  Thus, there would be no reason to allow amendment of Ms. Dunn's answer even if her request had been timely.  Her motion for reconsideration is denied.

IV.  Conclusion

In accordance with the foregoing, the Court determines, as did the Harris Committee, that the second, unsigned and undated beneficiary designation form was not effective to name or change Buddy's Cox's beneficiary.  Therefore, at the time of Buddy Cox's death in 2005, the effective form was the August 1990 form naming Thomas Cox as sole beneficiary of Buddy Cox's 401(k) funds.

It is further **ORDERED** and **ADJUDGED** that:

1.  The Unopposed Motion for Reconsideration and for Bifurcation (Doc. 98) filed by Plaintiff Jerri L. Dunn is **DENIED**.

2.  The ore tenus Motion for Judgment as a Matter of Law (see Doc. 109) made during trial on January 29, 2008 by Defendant Thomas Cox is **DENIED as moot**.

3.  The Clerk is directed to enter a judgment providing that Plaintiff Jerri Dunn shall take nothing in this action and that, as determined by the Harris Committee, Defendant Thomas Cox is the rightful beneficiary of the 401(k) funds of decedent Buddy Cox. Thereafter, the Clerk shall close this file.

---

[20]And, as noted earlier, to the extent that Harris's or anyone else's failure to send the unsigned form back to Buddy for a signature bears on the beneficiary determination, the Court has already considered that in this case and has concluded that Dr. Cox is the rightful beneficiary.

**DONE** and **ORDERED** in Orlando, Florida this 6th day of June, 2008.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party